OPINION OF THE COURT
David B. Saxe, J.
In America, the obligation to provide for the disadvantaged has been historically borne by private philanthropic societies and religious orders. In the twentieth century, the role of government expanded to include the responsibility for provid *189 ing care and assistance to those in need.[1] In recent years, however, government assistance to those individuals has been reduced[2] shifting the burden of providing care to the private sector.
Along these lines, the City of New York has enacted legislation requiring certain segments of the private order to assume a major responsibility for providing a solution to a current, critical social problem — providing housing for the large and growing number of homeless people in the City of New York.
The issue before me is whether the City of New York through its enactment of Local Laws, 1986, No. 22 is prevented, either by constitutional prohibitions or by lesser legal impediments from delegating this responsibility to the private sector in the manner chosen.
Briefly stated, Local Laws, 1986, No. 22, which amended Local Laws, 1985, No. 59, attempts to preserve and maintain single room occupancy multiple dwellings (SRO’s).[3] For years SRO units have served as relatively inexpensive housing for persons of low and moderate incomes, the elderly and individuals suffering from some form of physical or mental disability. The City Council enacted Local Laws Nos. 59 and 22 in the hope that preserving and maintaining SRO’s would limit the increasing number of homeless people in this city "thereby lessening the significant strain that providing shelter for the homeless has placed on the city’s resources”.
The enactment of Local Law No. 59 in August 1985 placed an 18-month moratorium on the demolition or alteration of SRO buildings retroactive to January 1985. The moratorium established by Local Law No. 59 was to expire on July 9, 1986. However, the City Council extended the moratorium on the demolition or conversion of SRO buildings until December 31, 1986 through the enactment of Local Law No. 22 § 2.
The scope of Local Law No. 22, however, was greater than merely imposing a moratorium on the demolition of SRO buildings; it imposed affirmative obligations on the owners of *190 buildings containing SRO units. These obligations require the owners to maintain these units in habitable conditions and, if these units are either vacant or in a state of disrepair, then the owners must renovate them and make them suitable for habitation (§ 4). All SRO units must then be rented at rents authorized by law (§ 4). The law also makes available to the Commissioner of the Department of Housing Preservation and Development (HPD) enforcement mechanisms as a means of policing SRO owners. First, there is a statutory rebuttable presumption that an owner has violated the law if an SRO unit is not occupied by a bona fide tenant for a period of 30 days or longer (§ 4). If an owner fails to comply with the local law the Commissioner may issue a citation for noncompliance which may include a civil penalty of $500 per dwelling unit cited plus a $250 per unit per day fine commencing 10 days after service of the citation running to the date of compliance (§4).
Significantly, these provisions only apply to private entities. The City of New York, itself an owner of a significant amount of residential-in-rem realty, is exempt from Local Law No. 22. (Local Laws, 1985, No. 59 of City of New York § 2; Administrative Code of City of New York § C26-118.10 [d] [1] [b] [ii].)
These affirmative obligations were to become effective on October 8, 1986. A few days before, a number of owner-developers of properties containing SRO units commenced applications to temporarily stay enforcement of these provisions by the City of New York. The plaintiffs also brought motions seeking preliminary injunctive and declaratory relief.[4]
Pending the determination of these motions, I temporarily stayed enforcement of Local Law No. 22 except as to those provisions prohibiting demolition and conversion.
The plaintiffs assert similar causes of actions in complaints which essentially contend that the City of New York must be permanently enjoined from enforcing Local Law No. 22 because: (a) the local law is unconstitutional as it is unreasonable, arbitrary and confiscatory and thus violates the due process clause, equal protection clause and "taking” clause of the United States and New York State Constitutions; (b) that *191 the City Council exceeded its constitutionally granted legislative authority in enacting provisions which directly conflict with State laws and which in fact preempt intrusion by the City Council in this area; (c) that the city failed to consider the environmental impact of Local Law No. 22 on existing population concentrations and which, if implemented, would not comply with the State Environmental Quality Review Act (SEQRA), City Environmental Quality Review (CEQR), and the Environmental Conservation Law (ECL); (d) Local Law No. 22 is more restrictive and stringent than the regulations in effect on June 1, 1970 and therefore violates the "Urstadt Law”; and (e) that the city failed to publish a notice for a hearing in the City Record as required by Municipal Home Rule Law § 20 (5) and Administrative Code of the City of New York § 38b-1.0.
In view of the common questions of law and fact present in all of these cases, the application by plaintiff Sutton East Associates for consolidation is granted. (CPLR 602 [a].) This decision will accordingly dispose of all of the applications for injunctive relief.
Preliminarily, a motion for leave to intervene as defendants in the Seawall Assoc, and 459 W. 43rd St. Corp. and Eastern Pork Prods. Co. actions was brought by the Coalition of the Homeless, a not-for-profit corporation and five of the tenants who reside in a building owned by Seawall Associates. The proposed intervenors contend that they have a sufficient interest in the outcome of this decision to permit them to intervene.
Pursuant to CPLR 1013, the court in its discretion may permit intervention "when the person’s claim or defense and the main action have a common question of law or fact”. Consideration should also be given to whether the intervention would delay the action or prejudice the substantial rights of any party.
Clearly, delay is not a bar here since the proposed intervenors have moved swiftly for the relief requested. There is also no claim of prejudice by the plaintiffs. Rather, the plaintiffs assert that the proposed intervenors do not have a substantial enough interest in the proceeding. Although it is true that the individual intervenors reside in only one of the plaintiffs’ buildings, they have a substantial interest in seeing that this legislation withstands a challenge. The opportunity to live in a fully rented and renovated building as opposed to a currently near-vacant and delapidated building is a concrete interest.
*192 The plaintiffs contend that the Coalition for the Homeless have an attenuated interest in this proceeding resembling the speculative interest of MFY Legal Services in Matter of MFY Legal Serve, v Dudley (67 NY2d 706 [1986]) in which the court denied the requested intervention. But, since intervention is to be liberally applied (Plantech Hous. v Conlan, 74 AD2d 920 [2d Dept 1980]), the interest of the Coalition for the Homeless in the legislation under scrutiny here is not speculative but indeed real, intervention is granted.
Accordingly, the motion for leave to intervene is granted.
MOTIONS FOR INJUNCTIVE RELIEF
Plaintiffs seek to enjoin the enforcement of Local Law No. 22 principally on the ground that its provisions lack legal merit and if enforced will cost them the loss of significant investments and anticipated profits. They further argue that the law has unconstitutionally deprived them of the purpose for which they initially purchased these buildings — to ultimately demolish them and to build modern structures which would yield profits commensurate with their investments and the current real estate market. The City of New York, claim the plaintiffs, has gone well beyond the permissible scope of its police powers and has instead enacted legislation which is tantamount to a "taking” of their property. The plaintiffs state that they will suffer irreparable injury through the violation of their constitutional rights as they will be forced to renovate these virtually vacant and delapidated buildings.
At the outset it must be recognized that plaintiffs are seeking interim relief which if awarded will grant them most, if not all, of the relief in the underlying complaint. Generally, courts are reluctant to grant such relief before a full hearing. (7A Weinstein-Korn-Miller, NY Civ Prac ¶ 6301.20.) This is so because the granting of injunctive relief is primarily dependent on the findings of merit to the underlying challenges and on the seriousness of the injury which would befall plaintiffs were the court to deny them injunctive relief and permit defendants to proceed. (Faberge Intl. v Di Pino, 109 AD2d 235 [1st Dept 1985].)
Based on the extensive and complete papers before the court and the extended oral argument held, I am prepared to make a determination as to the ultimate success of these challenges.
*193 CONSTITUTIONAL CHALLENGE
Is Local Law No. 22 unconstitutional as plaintiffs claim because it is unreasonable or confiscatory? Do its provisions constitute a deprivation of property rights in violation of constitutional limitations? (NY Const, art I, § 6; US Const, 14th Amend, § 1.)
The burden is first placed on the party challenging the constitutionality of a statute to prove that it is constitutionally infirm. (Seagram & Sons v Hostetter, 16 NY2d 47 [1965].) Every law has strong presumption of constitutionality which should be discarded only as a last resort. (Defiance Milk Prods. Co. v Du Mond, 309 NY 537 [1956].)
An instructive decision regarding the constitutional parameters of this type of regulation is French Investing Co. v City of New York (39 NY2d 587, appeal dismissed 429 US 990 [1976]). There, the Court of Appeals analyzed a zoning resolution in which the parties raised the same competing interests that are apparent here — the police power of the State to regulate private property in furtherance of the public’s safety, health and welfare and the constitutional limitations which are imposed on the State to ensure that it does not deprive an owner of the private use of his property.
The effect of the challenged zoning resolution in French Investing Co. (supra) was to make what was once privately owned parks located in the mid-Manhattan residential complex of Tudor City into open-public parks. The owner of these parks intended to develop the land for real estate projects, a right which under existing law the owner had. However, the new zoning resolution extinguished that right by prohibiting building on or over these parks. Instead, the law permitted the transfer of these developmental rights to other lot locations. The plaintiffs challenged the resolution arguing that the rezoning of the parks was a compensable taking and therefore unconstitutional.
The court, in an opinion written by Chief Judge Breitel, decided that the zoning law violated plaintiff’s constitutional rights. The law, he noted, was not a compensable taking but frustrated plaintiff’s legitimate property rights and expectations for use and, as a result, deprived plaintiffs of their rights without due process of law. Judge Breitel went on to explain the difficult and important constitutional distinction that exists between a compensable taking and noncompensable regulation. In his discussion, he excerpted a passage from *194 Lutheran Church v New York City (35 NY2d 121 [1974]) in which the court explained the difference as follows: "government interference [with the use of private property] is based on one of two concepts — either the government is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good, or in its arbitral capacity, where it intervenes to straighten out situations in which the citizenry is in conflict over land use or where one person’s use of his land is injurious to others (Sax, Taking and The Police Power, 74 Yale L.J. 36, 62, 63.) Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation” (supra, at pp 128-129).
However, even if a regulation does not amount to a compensable taking it may still be invalid. If the law imposes so onerous a burden on the property regulated and in effect deprives the owner of a reasonable income or other private use of his property thereby destroying its economic value, a regulation of this type amounts to a deprivation or frustration of property rights without due process of law and is therefore invalid.
As in French Investing Co. (supra), the provisions of Local Law No. 22 do not constitute a compensable taking. They are noncompensable regulations. So, the court’s inquiry must be whether these regulations impose so onerous a burden on the property regulated that it has deprived or frustrated the owners’ property rights without due process of law.
The answer must begin with a recognition that challenges to land use regulation and the reasonableness of the police power exercised depend on many variables and an evaluation of each case.
The defendants and intervenors argue that the City Council, after a review of the homeless problem,[5] enacted this legislation in furtherance of its police power for the protection of the health, safety and welfare of the public. The defendants claim that the law serves to meet a critical need for low-income housing which may also effect the homeless population. The *195 defendants also argue that although the plaintiffs may not obtain as great a return on their investments as they had anticipated, the rooms will be protected by rent stabilization and therefore owners will receive a fair rent on these units.
In support of this argument, the defendants and interveners point to Penn Cent. Transp. Co. v City of New York (438 US 104 [1978]) in which the United States Supreme Court upheld the constitutionality of the New York City Landmark Law. However, that case is not dispositive. While the Landmark Law restricts some uses of the land, it does not completely change the owner’s expected use of its property; nor does it impose so crushing a financial and rehabilitative burden on the property owner as the provisions of Local Law No. 22 require. Notably, the Supreme Court stated that the Landmark Law which provided transferable development rights to other locations provided the owners with significant compensation for the loss of rights above the terminal (at p 121). Further, the Landmark Law did not alter the property’s use; rather, it sought to preserve the existing use.
Although the defendants argue that similarly Local Law No. 22 merely preserves existing SRO housing, it seeks to accomplish that goal by taking away all development rights of property owners by requiring that they invest thousands of dollars to rehabilitate these units. It also requires owners to be in a business in which they had no intention, expertise or expectation of being involved in. Owners of property subject to the Landmark Law are constrained but they are not nearly as saddled with the extensive obligations which Local Law No. 22 requires of SRO property owners.[6]
Significantly, these SRO buildings owned by plaintiffs are *196 virtually vacant. Moreover, the buildings and unoccupied rooms are in a bad state of repair. Were SRO buildings fully occupied and maintained in good repair there would be no need to enact emergency measures to preserve and maintain them. The plaintiffs claim that they purchased these buildings in the anticipation of ultimately demolishing them. They invested millions of dollars toward that goal. Knowing the law at the time, none of the plaintiffs expected to find themselves as owners and managers of rent-stabilized SRO buildings — in perpetuity.
Reliance on Spring Realty Co. v New York City Loft Bd. (127 Misc 2d 1090, affd 117 AD2d 1029, mod 69 NY2d 657), is therefore misplaced. In this case the court rejected the loft owner’s argument that imposing rent stabilization would cost them great personal expense and therefore was unconstitutional. The distinction between the plaintiff’s position there and here is that those landlords had knowledge of the illegal residential tenancies. The Loft Law instituted a regulatory scheme which balanced what had already been the de facto status of the tenants. Pursuant to Local Law No. 22, a landlord-tenant relationship is being created by requiring owners to rent their now vacant units. Local Law No. 22 does not recognize an existing relationship; it creates a relationship where virtually none exists at all.
Laws which in some manner regulate the use of property rather than dictate the owner’s use of the property have withstood constitutional challenge. For instance, a receivership law was upheld in Matter of Department of Bldgs. (Philco Realty Corp.) (14 NY2d 291 [1964]). The law imposed duties on the building owner to remedy dangerous conditions and, if not done, the City of New York would make the repairs itself and place the building in receivership. However, unlike Local Law No. 22, the receivership law is remedial in nature and specifically contains provisions by which the owner can ultimately regain control of the building.
In Park Ave. Tower Assoc. v City of New York (746 F2d 135 [2d Cir 1984], cert denied sub nom. 40 Eastco v City of New York, 470 US 1087 [1985]), a zoning resolution which decreased the maximum floor area ratio for buildings under construction was upheld against a constitutional "taking” challenge. The claim was based entirely on the diminished value of the commercial property. Plaintiffs’ claim here *197 includes but goes beyond the loss of the commercial value of the property; it includes the claim that the antivacancy provisions deny them the use of their property and requires them to rehabilitate the buildings.
During the oral argument, the attorneys for defendant-intervenors asserted that the unsuccessful challenge to Local Laws, 1983, No. 19 of the City of New York, which requires SRO owners to obtain certificates of no harassment before being granted a permit to demolish the building is ample authority to support the constitutionality of this law. (Sadowski v City of New York, 578 F Supp 1577 [SONY], affd 732 F2d 312 [2d Cir 1984].) This court disagrees. Local Law No. 19 is less restrictive not more restrictive than Local Law No. 22. Local Law No. 19 merely ensures that SRO owners do not harass tenants in order to vacate the building. Local Law No. 22 does not impose restrictions on the procedure used to vacate a building; it repeals those rights altogether.
Local Law No. 22 places petitioners in a business, forces them to remain in that business and refuses to allow them to ever cease doing business. There is a provision which provides that if plaintiffs pay $60,000[7] (earmarked for a housing fund), they may take the unit off the SRO rental market. However, as the law is worded, it is not clear, even after all of the units have been purchased back by the owner, whether a building could still be demolished. In any event, a law which abrogates the right to cease doing business is constitutionally suspect. (See, Textile Workers v Darlington Co., 380 US 263 [1965].)
There is a shortage of low-income housing in New York City caused by a combination of economic, political and social factors. But, the solution is not in imposing an undue and uncompensated burden on the individual owners of SRO buildings in the guise of regulating for a public purpose. (Lutheran Church v City of New York, 35 NY2d 121 [1974].) These regulations impose an unreasonable and arbitrary scheme and frustrate plaintiffs’ property rights without due process of law. Legitimate land use regulations must stop short of these restrictions.
PREEMPTION CHALLENGE
Plaintiffs contend that Local Law No. 22 is unconstitutional *198 because the City Council acted beyond its legislative authority. First, they assert that the law intrudes into an area that has been entirely preempted by the State. Second, they argue that the law is inconsistent with a general law enacted by the State. In either case, both the NY Constitution and the Municipal Home Rule Law[8] limit local government enactments which are either preempted by or are inconsistent with the general law.
It has been recognized that when local government enacts a law which intrudes into an area that the State has preempted, the enactment is null and void. (Consolidated Edison Co. v Town of Red Hook, 60 NY2d 99 [1983]; Matter of Landsdown Entertainment Corp. v New York Dept. of Consumer Affairs, 133 Misc 2d 206 [Sup Ct, NY County 1986].) But State legislation on a particular subject does not necessarily establish preemption. If a town or other local government is authorized to legislate it is not forbidden to do so unless "the State * * * has evinced an unmistakable desire to avoid the possibility that the local legislation will not be on all fours with that of the State” (People v New York Trap Rock Corp., 57 NY2d 371, 378 [1982]).
Plaintiffs’ preemption claims rests on enactment of Laws of 1983 (ch 403), the Omnibus Housing Act. Specifically, it is argued that when the City of New York, on April 1, 1984, delegated the administration and enforcement of the Emergency Tenant Protection Act (L 1974, ch 576, § 4) and Rent Stabilization Law (Administrative Code § YY51-1.0 et seq.) to the New York State Division of Housing and Community Renewal (DHCR), the State preempted any further local regulation of housing accommodations.
The inquiry then is whether by enacting the Omnibus Housing Act the State evidenced an intent to entirely preempt the field of housing regulation.
*199 A review of the State legislation at issue in this case fails to disclose an intention to entirely preclude local regulation affecting rent-controlled and rent-stabilized housing units. The DHCR was given administrative and enforcement responsibilities. However, the city is still empowered to regulate controlled and stabilized accommodations as indicated in the enabling statute for the Emergency Tenant Protection Act and Rent Stabilization Law (McKinney’s Uncons Laws of NY § 8605 [Local Emergency Housing Rent Control Act § 5; L 1962, ch 21, § 1, as amended]). Thus, the State’s enactment of the Omnibus Housing Act left unaffected the city’s authority pursuant to the Emergency Tenant Protection Act and Rent Stabilization Law enabling law.
The plaintiffs further claim that even if the entire field of rental accommodations is not preempted by State law that Local Law No. 22 is invalid because its provisions are inconsistent with various specific Emergency Tenant Protection Act, Rent Stabilization Law and Multiple Dwelling Law provisions regarding vacancy and demolition. Thus, plaintiffs claim that even when State legislation does not preempt a field of regulation, a local law that is inconsistent with a general State law may be invalidated (Consolidated Edison Co. v Town of Red Hook, supra, at p 107). A local law may be struck down if the court finds either that it permits an act which has been specifically prohibited by the State law or conversely, that the law prohibits an act which has been specifically permitted by State law (Council for Owner Occupied Hous. v Koch, 119 Misc 2d 241, 245 [Sup Ct, NY County 1983], affd on opn below 61 NY2d 942 [1984]).
Prior to enactment of Local Law No. 22 owners of vacant rent-controlled SRO units had the right to keep these units vacant (9 NYCRR 2200.12). These owners also had the right to demolish their buildings (9 NYCRR 2204.8 [a]). Prior to obtaining a permit to demolish a building the owners must comply with various provisions which are designed to protect the tenant and provide assurance that the tenant is relocated. Demolition is not approved by DHCR unless certain requirements are met, i.e., owners’ hardship. Further, the New York City Rent and Eviction Regulations which make particular reference to tenants of SRO units describe the conditions for the relocation of a tenant which include placing the tenant in alternative housing and paying to that tenant a specified stipend (9 NYCRR 2204.4 [a], [e] [1] [i] [a]; [3] [ii], [v]). The city *200 regulations also permit the tenant and owner to negotiate and to agree on the suitability of replacement housing (9 NYCRR 2204.4 [e] [1] [i]). And, finally, plaintiffs claim that Multiple Dwelling Law § 248 contains a comprehensive regulatory scheme regarding SRO unit operation.
In other words, plaintiffs claim that there currently exist laws which give property owners the right to keep rooms vacant, the right to obtain a demolition permit after complying with various regulations, and the right to relocate tenants with their consent to other housing. However, if Local Law No. 22 (and No. 59) is upheld, only property owners of buildings with SRO units will lose these rights. Instead, the City Council and the Mayor have become the final arbiters of this landlord-tenant relationship by creating laws which directly conflict with State laws.
Despite defendants’ arguments to the contrary, it is clear that under Local Law No. 22, these property owners have lost the use of their property which other property owners have available to them. Local Law No. 22 is directly inconsistent with existing law.
But, inconsistencies with State laws do not in itself make this law unconstitutional. The State Constitution and Municipal Home Rule Law prohibition on local enactment of inconsistent laws applies only to local inconsistency with "general” State law. (Council for Owner Occupied Hous. v Koch, supra; Sonmax, Inc. v City of New York, 43 NY2d 253 [1977].)
Municipal Home Rule Law § 2 (5) and (12) define "general” and "special” laws as follows:
"5. 'General law.’ A state statute which in terms and in effect applies alike to all counties, all counties other than those wholly included within a city, all cities, all towns or all villages.”
"12. 'Special law.’ A state statute which in terms and in effect applies to one or more, but not all, counties, counties other than those wholly included within a city, cities, towns or villages.”
Here, all of the claimed rent control and rent stabilization laws regarding vacancy and demolition are State statutory amendments to the Administrative Code, the city’s own law. They are special laws as they effect only New York City. Therefore, if the council enacts special laws in furtherance of its police power which conflict with other special laws they are not acting beyond their constitutional authority.
*201 Plaintiffs claim that Local Law No. 22 is invalid because of its inconsistency with the Multiple Dwelling Law is wrong. The cited provisions of Multiple Dwelling Law § 248 are not applicable to plaintiffs’ buildings which are apparently class B dwellings.
Plaintiffs also challenge the authority of the City Council rather than the Board of Estimate to enact laws which plaintiffs contend are land use regulations. However, there was no impropriety for the City Council rather than the Board of Estimate to have enacted these laws. First, Local Law No. 22 is not inconsistent with any zoning resolution. And second, Local Law No. 22 was enacted by the City Council in furtherance of the police power and contains no provisions which approach the type of land use regulation whose power to enact is vested in the Board of Estimate.
THE "URSTADT LAW” CHALLENGE
Plaintiffs’ claim that the provisions of Local Law No. 22 violate the "Urstadt Law”. The Urstadt Law was enacted in 1971 as an amendment to the State enabling act. The law prohibits the enactment of a local law which subjects rent-controlled housing accommodations to more stringent or restrictive regulations and control that were in effect on June 1, 1971. (L 1971, ch 372.) It is claimed that this local law violates the Urstadt Law because it requires the rental of vacant housing accommodations and it subjects housing accommodations not previously regulated to regulation and control.
Plaintiffs argument is unpersuasive. The Urstadt Law does not apply to this type of regulatory scheme. A reading of the Urstadt provisions as well as its legislative history[9] indicates that the Urstadt Law was aimed at prohibiting more stringent or restrictive local regulation of the rents that landlords could charge. The law recognized the need to ensure that landlords obtained a sufficient financial return to maintain existing housing. The provisions of Local Law No. 22 are not aimed at restricting the amount of rent an owner may charge for particular units. Local Law No. 22 goes beyond the mere regulation of rental amounts and creates a broader scheme to preserve SRO units. For these reasons, plaintiffs’ reliance on Mayer v City Rent Agency (46 NY2d 139 [1978]) is misplaced. Mayer (supra) involved a local law which required that the *202 labor cost pass-along be included and not added to the 1V2% permitted rental increases. In effect, the law reduced the landlord’s return on a rental unit and was more restrictive than what landlords were previously entitled to under the existing law. Similarly, in Matter of 241 E. 22nd St. Corp. v City Rent Agency (33 NY2d 134 [1973]), the Court of Appeals invalidated a law which extinguished the maximum base rent system as more restrictive than the existing law. Therefore, this too violated the Urstadt Law.
THE MUNICIPAL HOME RULE LAW CHALLENGE
Plaintiffs also call into question the notice procedures by which defendants enacted Local Law No. 22. Municipal Home Rule Law §20 (5) requires that there be a public hearing before a local law is approved. Five days’ notice of the hearing must be given and the notice shall be published in the City Record as well as in other daily newspapers.[10]
The City Council passed Local Law No. 22 on June 29, 1986. Mayor Koch signed the bill on July 8, 1986. Although a hearing was held on July 8th, notice of the July 8th hearing on Local Law No. 22 was not printed in the City Record although the New York Post published a notice that a hearing on various bills was to be held on July 8, 1986. In an attempt to remedy this error, the City Council mailed letters to various interest groups apprising them of the hearing date for Local Law No. 22.
In spite of this deficiency, defendants argue that the public was sufficiently apprised of the hearing as to comport with the Municipal Home Rule Law. The decision most dispositive of this issue is 41 Kew Gardens Rd. Assocs. v Tyburski (NYLJ, Oct. 3, 1986, p 16, col 2, affd 124 AD2d 553). 41 Kew Gardens coincidentally involved another local law which was supposed to be signed by Mayor Koch on the same day as Local Law No. 22 — July 8, 1986. However, the City Record printed July 9th instead of July 8th as the date for the hearing.
*203 Both the Supreme Court and Appellate Division found that the failure to give the proper date for the hearing was not a technical oversight "the noncompliance at bar goes to the substance of those provisions and thwarts their legislative purpose.” (124 AD2d 553, 554, supra.) These local laws were unenforceable unless the City Council complied with the Municipal Home Rule Law notice requirements.
Here, the City Council did not fail to give the correct date for the hearing on Local Law No. 22; it did not print notice of the hearing in the City Record at all. That deficiency renders it unenforceable. However, it also appears that Local Law No. 22 was passed again by the City Council on November 20, 1986, that notice of the Mayor’s hearing was provided in the December 2, 1986 addition of the City Record and the New York Post and that after a hearing conducted on December 8, 1986, the Mayor approved the law.
Accordingly, the challenge based on the failure to comply with the notice provisions of Municipal Home Rule Law is moot.
ENVIRONMENTAL (SEQRA) CHALLENGES
Finally, the plaintiffs assert that the provisions of Local Law No. 22 may have an impact on the environment as that term is defined in State environmental law provisions. Therefore, they contend that the regulatory scheme set forth in the State Environmental Quality Review Act (SEQRA), ECL article 8, and the regulations thereunder, 6 NYCRR part 617 and CEQR, have not, but must be complied with before the City Council enacts Local Law No. 22.
Preliminarily, the thrust of petitioners’ claim here is that the rehabilitation and rental of SRO buildings may have an impact on the environment. The definition of environment must be liberally interpreted if this court is to find that argument persuasive. The definition of environment in ECL 8-0105 (6) includes "existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character”. (6 NYCRR 617.2 [k]; CEQR §1 [f].) Whether the provisions of SEQRA are triggered when certain building projects and zoning plans are enacted was recently addressed by he Court of Appeals decision of Chinese Staff & Workers Assn. v City of New York (68 NY2d 359).
However, before I can reach the substantive issues involved there is a question as to whether plaintiffs, in the first *204 instance, have standing to raise this challenge. Defendants contend that the harm plaintiffs will suffer by enactment of Local Law No. 22 is economic, not environmental. Defendants claim plaintiffs do not reside either in or in close proximity to the neighborhood where the SRO properties are located. Plaintiffs are partnerships, associations and corporations. They do not operate ongoing businesses in these neighborhoods. Therefore, defendants contend that any change to the environment or to the population of the community would not harm plaintiffs and further that this harm is not within the zone of interest to be protected by the SEQRA statute (Matter of Dairylea Coop, v Walkley, 38 NY2d 6 [1975]).
The zone of interest test has been recognized as a more liberal standing test (Matter of Fritz v Huntington Hosp., 39 NY2d 339 [1976]). Plaintiffs need only demonstrate that the environmental consequences of the project fall within the interests protected by SEQRA (Glen Head — Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484 [2d Dept 1982]). In Glen Head — Glenwood Landing Civic Council v Town of Oyster Bay (supra) plaintiff challenged the rezoning of property from a single-family residential district to a condominium zoned district. The court disposed of the standing argument on the ground that plaintiffs were individuals and members of the civic association who lived in close proximity to the acreage in issue. The court then found (p 490) that the asserted environmental consequences of the rezoning fell within their "zone of interest” protected by SEQRA.
Similarly, in the recent Court of Appeals decision of Chinese Staff & Workers Assn. v City of New York (supra) the plaintiffs were members of the Chinatown community who challenged the granting of a special zoning permit authorizing construction of a high-rise luxury condominium in Chinatown. Their argument was that such a project might ultimately displace neighborhood residents and people with businesses, such as themselves, and therefore have an environmental impact on the quality of their lives.
Plaintiffs here are not residents of the community which may be affected by the provisions of Local Law No. 22 nor do they operate local businesses in the neighborhoods which contain SRO buildings. Plaintiffs are the owners of the SRO buildings and are not otherwise part of or in close proximity to the neighborhood which these provisions affect. Their interests though valid in other respects are not environmental.
*205 Therefore, the court finds that plaintiffs lack the requisite standing to assert the SEQRA arguments.
IRREPARABLE INJURY
A violation of constitutional due process rights constitutes irreparable injury. Local Law No. 22 is unconstitutional and unenforceable on the ground that it violates basic constitutional due process rights of SRO property owners. Irreparable injury to the owners therefore exists. Moreover, the failure to preserve the status quo would require plaintiffs to begin extensive rehabilitation work at the risk of being fined thousands of dollars, almost immediately.
Accordingly, those provisions of Local Law No. 22 which impose the affirmative obligations on plaintiffs to rehabilitate all vacant SRO units and to rent them to bona fide tenants (§ 4) are declared invalid. Defendants are enjoined from enforcing those provisions.

. Boorstein, The Americans — The Democratic Experience at 214-215 (1st ed 1974).

. According to a recently conducted study of single room occupancy (SRO) units, there has been a real reduction in Federal and State assistance for needy households. This has contributed significantly to the emergency conditions in New York City’s low-income housing market. (Single Room Occupancy in New York City, at 5-2 [Jan. 1986].)

. An SRO may be broadly defined as a living unit which shares a kitchen and/or bathroom with one or more other units.

. These plaintiffs are: (a) Seawall Associates, a partnership (index No. 20891/86); (b) 459 West 43rd Street Corp. and Eastern Pork Products Co. (index No. 21213/86); (c) Sutton East Associates — 86, a New York partnership and Channel Club (index No. 22441/86); and (d) Anbe Realty Co., a copartnership (index No. 25603/86).

. The study commissioned by the City Council was delivered in January 1986 to the New York City Department of Housing Preservation and Development (Blackburn Report) and was submitted as defendant’s exhibit A.

. In a similar vein neither did the two land use regulatory schemes which were challenged and then upheld by the California courts in Nash v City of Santa Monica (37 Cal 3d 97, 207 Cal Rptr 285, 688 P2d 894 [Oct. 1984]) and Terminal Plaza Corp. v City & County of San Francisco (177 Cal App 3d 892, 223 Cal Rptr 379 [1st Dist 1986]). In Nash (supra), for instance, a demolition permit law was upheld. Nash, conceded that he could earn a fair return on his investment and Nash was free under the ordinance to withhold rental units from the market as they became vacant. In Terminal Plaza, a permit to convert housing could be granted, if the owners fulfilled certain requirements. One requirement was for the owner to provide relocation assistance to hotel residents. Under the laws existing prior to the enactment of Local Law No. 22 as well as currently existing property owners must relocate tenants in order to vacate the unit or apartment, or must agree on a fee for the tenant to relocate. Plaintiffs here are not challenging these laws nor would these laws if challenged be invalidated. Local Law No. 22 does not give the owner any option to relocate these *196 tenants nor to negotiate with them on a fee to vacate the rooms. That’s just the crucial point which plaintiffs are trying to impress upon the court.

. Under one proposed City Council plan, effective 1987, that amount would be reduced to $35,000 and under another plan the amount would be $45,000.

. NY Constitution, article IX, § 2 (c) (ii) and Municipal Home Rule Law § 10 (1) (ii) limit the power of local legislatures, such as that of the City of New York. The State Constitution provides:
"[Ejvery local government shall have power to adopt and amend local laws not inconsistent with the provisions of this constitution or any general law relating to the following subjects, whether or not they relate to the property, affairs or government of such, local government, except to the extent that the legislature shall restrict the adoption of such a local law relating to other than the property, affairs or government of such local government * * *
"(10) The government, protection, order, conduct, safety, health and well-being of persons or property therein.” (NY Const, art IX, §2 [c] [ii] [10]; emphasis added.)

. Memorandum of the State Executive Department in support of the Urstadt Amendment.

. "[N]o such local law shall be approved by the elected chief executive officer until a public hearing thereon has been had before him. Such a public hearing * * * shall be * * * upon five days’ notice”. (Municipal Home Rule Law § 20 [5].)
"The notice prescribed in subdivision five of section twenty of the municipal home rule law shall be published in the City Record and in such daily newspaper or newspapers, published in the city of New York, as shall be selected by the mayor for that purpose.” (Administrative Code of City of New York § 38b-1.0.)