OPINION OF THE COURT
Hancock, Jr., J.
Local Law No. 9 prohibits the demolition, alteration, or conversion of single-room occupancy (SRO) properties and obligates the owners to restore all units to habitable condition and lease them at controlled rents for an indefinite period. Plaintiffs, real estate developers who own SRO properties, challenge the law as an unconstitutional taking of private property without just compensation. Defendants, the City of New York and various officials, contend that the law is a valid effort to help prevent homelessness by preserving the stock of low-rent SRO housing. In our view, Local Law No. 9 is facially invalid as both a physical and regulatory taking in violation of the Federal and State Constitutions and we, therefore, declare it null and void.
I
After years of encouraging the demolition and redevelopment of SRO properties — which the City of New York considered substandard housing — the City abandoned its policy when it found that the stock of low-cost rental housing was shrinking at an alarming rate (see, Blackburn, Single Room Occupancy in New York City, at 1-4 to 1-7).[1] On August 5, 1985, the City enacted Local Law No. 59 which imposed an 18-month moratorium on the demolition or conversion of structures containing SRO units. Thereafter, Local Law No. 22 was *100 enacted to extend the moratorium through the end of 1986. Local Law No. 22 added the requirement that owners of SRO properties rehabilitate all vacant units and offer them for rent, and it provided for substantial monetary penalties for noncompliance.
Plaintiffs commenced separate actions challenging Local Law No. 22 as violative of the "Takings” Clauses of the Federal and State Constitutions. Supreme Court consolidated the actions and declared the law invalid to the extent that it imposed affirmative obligations on property owners to rehabilitate and then rent vacant units (134 Misc 2d 187). The City did not perfect an appeal; it did, however, alter the provisions of Local Law No. 22 by enacting Local Law No. 1 on February 2, 1987, which, in turn, was amended and reenacted as Local Law No. 9 on March 5, 1987. Local Law No. 9 extended the prior moratorium for an initial five-year period with the possibility of unlimited renewals. The law retains most of the features which were contained in Local Law No. 22 but also provides for certain "exemptions” for otherwise obligated property owners.
The main provisions of Local Law No. 9 are as follows:
Moratorium. The conversion, alteration and demolition of SRO multiple dwellings are prohibited (Administrative Code of City of New York § 27-198.2); the moratorium extends for five years and is renewable for additional five-year periods as the City Council deems necessary (Local Laws, 1987, No. 9 of City of New York §7).
Rehabilitation and Antiwarehousing. SRO property owners must rehabilitate and make habitable every SRO unit in their buildings, and lease every unit to a "bona fide” tenant ("rent-up” obligation) at controlled rents (Administrative Code § 27-2151 [a]); an owner is presumed to have violated these requirements if any unit remains vacant for a period of 30 days (§ 27-2152 [d]).
Penalties. Noncompliance is punishable by fines including $150,000 for each dwelling unlawfully altered, converted or demolished, with an additional $45,000 per unit for reducing the total number of units (§ 27-198.2 [g] [2] [5]); a $500 per unit penalty is provided for each unit unrented to a bona fide tenant (§ 27-2152 [e]).
Buy-Out and Replacement Exemptions. An owner may purchase an exemption from the moratorium by payment of *101 $45,000 per unit (or such other amount as the Commissioner of the Department of Housing Preservation and Development determines would equal the cost of a replacement unit) or by providing an equal number of replacement units approved by the Commissioner (§ 27-198.2 [d] [4] [a] [i], [ii]).
Hardship Exemption. The amount of payment or the number of replacement units required for an exemption may be reduced at the discretion of the Commissioner, in whole or in part, if "there is no reasonable possibility that such owner can make a reasonable rate of return”, defined as a net annual return of 8Vi% of the assessed value of the property as an SRO multiple dwelling (§ 27-198.2 [d] [4] [b]).
Plaintiffs instituted the present action challenging Local Law No. 9 on the same grounds that they had earlier challenged Local Law No. 22. Supreme Court, in another thorough opinion by Justice David B. Saxe, held that the so-called "buyout”, "replacement”, and "hardship” exemptions failed to save Local Law No. 9 from the infirmities of its predecessor, and concluded that the law was invalid as a taking without just compensation in violation of both the Federal and State Constitutions. The Appellate Division disagreed, declaring the law constitutional in all respects. For the following reasons, we now reverse.
II
"The Fifth Amendment’s guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (Armstrong v United States, 364 US 40, 49). The corollary to this oft-quoted proposition is that "government action that works a taking of property rights necessarily implicates the 'constitutional obligation to pay just compensation’ ” (First Lutheran Church v Los Angeles County, 482 US 304, 315, quoting Armstrong v United States, supra, at 49). The question here, as in any case where government action is challenged as violative of the right to just compensation, is whether the uncompensated obligations and restrictions imposed by the. governmental action force individual property owners to bear more than a just share of obligations which are rightfully those of society at large.
In our opinion, the provisions of Local Law No. 9, which not *102 only prevent the SRO property owners from developing their properties by replacing the existing structures, but also compel them to refurbish the structures and keep them fully rented, impose on the property owners more than their just share of such societal obligations. Whether viewed as effecting a physical or regulatory taking, Local Law No. 9, we believe, violates the "Takings” Clauses of the Fifth Amendment of the Federal Constitution[2] and article I, § 7 of the New York State Constitution.
A
Plaintiffs contend that Local Law No. 9 has resulted in a physical occupation of their properties and is, therefore, a per se compensable taking (see, Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 427). We agree. As emphasized by Professor Michelman in his article quoted with approval in Loretto, "[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly’ use, or 'permanently’ occupy, space or a thing which theretofore was understood to be under private ownership” (footnotes omitted) (Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation” Law, 80 Harv L Rev 1165, 1184 [1967]).
Whether the mandatory "rent-up” obligations of the antiwarehousing provision effect a physical taking depends upon the nature and extent of their interference with certain essential property rights. Here, the claimed physical taking is the City’s forced control over the owners’ possessory interests in their properties, including the denial of the owners’ rights to exclude others. Local Law No. 9 requires the owners to rent their rooms or be subject to severe penalties; it compels them to admit persons as tenants with all of the possessory and other rights that that status entails; it compels them to surrender the most basic attributes of private property, the rights of possession and exclusion. This, plaintiffs contend, constitutes a physical occupation of private property for public use, similar to encroachments on structures or land such as the mandated installation of CATV cables and fixtures (see, Loretto v Teleprompter Manhattan CATV Corp., supra), the *103 permanent flooding from the construction of a dam (see, e.g., United States v Lynah, 188 US 445; Pumpelly v Green Bay Co., 13 Wall [80 US] 166), or the invasion of air space and resulting interference with the land use below by continuous low altitude airplane flights (see, United States v Causby, 328 US 256). Defendants argue that a physical taking must entail the kind of palpable invasion involved in those cases and, therefore, that the deprivation of intangible property rights alone, such as that resulting from coerced tenancies, is not enough. We disagree. Where, as here, owners are forced to accept the occupation of their properties by persons not already in residence, the resulting deprivation of rights in those properties is sufficient to constitute a physical taking for which compensation is required.
Under the traditional conception of property, the most important of the various rights of an owner is the right of possession which includes the right to exclude others from occupying or using the space (see, Loretto v Teleprompter Manhattan CATV Corp., supra, at 435). Thus, in Loretto, the Supreme Court relied upon this classical view of property— "the rights 'to possess, use and dispose’ ” (458 US, at 435, quoting United States v General Motors Corp., 323 US 373, 378) — to hold that the required installation of the CATV cables and equipment on plaintiffs building was a per se physical taking. This right to exclude "has traditionally been considered one of the most treasured strands in an owner’s bundle of property rights.” (Loretto v Teleprompter Manhattan CATV Corp., supra, at 435, citing Kaiser Aetna v United States, 444 US 164, 179-180; see also, Restatement of Property § 7 [1936]; Radin, The Liberal Conception of Property: Cross Currents in the Jurisdiction of Takings, 88 Colum L Rev 1667, 1671-1672.) As the court noted in Loretto, "an owner suffers a special kind of injury when a stranger directly invades and occupies the owner’s property”, and "property law has long protected an owner’s expectation that he will be relatively undisturbed at least in the possession of his property” (see, Loretto Teleprompter Manhattan CATV Corp., supra, at 436 [emphasis in original]; see also, Michelman, op. cit., 80 Harv L Rev, at 1165, 1228, and n 110). Moreover, to constitute a physical taking, the occupation need not be by the government itself, but may be by third parties under its authority (Loretto v Teleprompter Manhattan CATV Corp., supra, at 432, 433, n 9).
Defendants argue, nevertheless, that a physical taking re *104 quires something more than an ouster of the owner’s possessory interest by the forced intrusion of strangers; that there must be some actual displacement of the owner’s possession through a fixed encroachment like the TV equipment in Loretto or an invasion of property like the flooding in Pumpelly. But the decisional law is to the contrary. As the Supreme Court explained in Nollan v California Coastal Commn. (483 US 825), a physical occupation requiring just compensation results where individuals are given the "right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises” (id., at 832). Likewise, in Kaiser Aetna, in concluding that the government’s imposition of a navigational servitude requiring public access to a private pond and marina would "result in an actual physical invasion of the privately owned marina”, the court emphasized that the right to exclude, thus taken from the owner, is "one of the most essential sticks in the bundle of rights that are commonly characterized as property” (444 US, at 176,180).[3]
Although the Supreme Court has not passed on the specific issue of whether the loss of possessory interests, including the right to exclude, resulting from tenancies coerced by the government would constitute a per se physical taking, we believe that it would. Indeed, it is difficult to see how such forced occupancy of one’s property could not do so. By any ordinary standard, such interference with an owner’s rights to possession and exclusion is far more offensive and invasive than the easements in Kaiser Aetna or Nollan or the installation of the CATV equipment in Loretto (see, Michelman, Takings, 1987, 88 Colum L Rev 1600, 1609, n 46; see also, Hall v City of Santa Barbara, 833 F2d 1270 [9th Cir], cert denied 485 US 940 [an ordinance imposing *105 mandatory rental obligations on mobile home operators could constitute a per se physical taking under Loretto]).[4]
Contrary to defendants’ contentions, the decisions of the Supreme Court and this court upholding rent control and similar regulations of housing conditions and other aspects of the landlord-tenant relationship (see, e.g., Bowles v Willing-ham, 321 US 503, 517-518; Loab Estates v Druhe, 300 NY 176, 180; see also, cases cited in Loretto v Teleprompter Manhattan CATV Corp., supra, at 440) do not undermine plaintiffs’ claims of per se physical takings. Indeed, those decisions have no bearing on the question here — whether forcing plaintiffs to rent their properties to strangers constitutes a physical taking. It is the nature of the intrusion which is determinative— i.e., that it deprives the owners of their rights to possession and exclusion — not the beneficial purpose of the regulation or the extent of the police power which authorizes it. Thus, the Loretto court, in referring to Bowles v Willingham and similar cases, dispelled the notion that its physical-taking holding would affect "the government’s power to adjust landlord-tenant relationships”; the court was quick to distinguish landlord-tenant cases from those in which "the government authorize[d] the permanent occupation of the landlord’s property by a third party” (458 US, at 440).
The rent-control and other landlord-tenant regulations that have been upheld by the Supreme Court and this court merely involved restrictions imposed on existing tenancies where the landlords had voluntarily put their properties to use for residential housing. Unlike Local Law No. 9, however, those regulations did not force the owners, in the first instance, to subject their properties to a use which they neither planned nor desired. The local law at issue in Loab Estates, for example, barred the eviction of residential tenants unless provisions had been made for their relocation (300 NY, at 179). And the Federal rent-control statute in Bowles explicitly *106 did not require "any person * * * to offer any accommodations for rent” (321 US, at 517). By sharp contrast to the statutes in Loab Estates and Bowles, Local Law No. 9 compels owners to be residential landlords; it requires owners to rehabilitate and offer their properties for rent, as SRO units, to persons with whom they have no existing landlord-tenant relationship.
The City, however, argues that, although the owners are compelled to rent their units, there can be no physical taking here because they have not been divested of all control over the selection of tenants and the rental terms. But this minimal authority retained by the owners over their own properties does not distinguish the City’s action here from other physical takings. It is the forced occupation by strangers under the rent-up provisions of the law, not the identities of the new tenants or the terms of the leases, which deprives the owners of their possessory interests and results in physical takings.[5]
We conclude that Local Law No. 9 has effected a per se physical taking because it "interfere[s] so drastically” (Nollan v California Coastal Commn., supra, at 836) with the SRO property owners’ fundamental rights to possess and to exclude (see, Loretto v Teleprompter Manhattan CATV Corp., supra, at 435-436). The law requires nothing less of the owners than "to suffer the physical occupation of [their] building[s] by third part[ies]” (id., at 440; see also, Kaiser Aetna v United States, supra, at 179-180).
B
Even if Local Law No. 9 were not held to effect a physical taking, it would still be facially invalid as a regulatory taking. *107 "Suffice it to say that government regulation — by definition— involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property” (Andrus v Allard, 444 US 51, 65). But the constitutional guarantee against uncompensated takings is violated when the adjustment of rights for the public good becomes so disproportionate that it can be said that the governmental action is "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (Armstrong v United States, supra, at 49). There is no "set formula” for determining in all cases when an adjustment of rights has reached the point when "justice and fairness” require that compensation be paid (see, Penn Cent. Transp. Co. v New York City, 438 US 104, 124). It is basic, however, that such a burden-shifting regulation of the use of private property will, without more, constitute a taking: (1) if it denies an owner economically viable use of his property, or (2) if it does not substantially advance legitimate State interests (see, Nollan v California Coastal Commn., supra, at 834; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 485, 495; Agins v Tiburon, 447 US 255, 260; Penn Cent. Transp. Co. v New York City, supra, at 138, n 36).[6] Either would be sufficient to invalidate a property-use regulation. In our opinion, Local Law No. 9 fails on both counts. We turn first to whether the law denies owners the economically viable use of their properties.
(1)
Putting aside for the moment a discussion of the buy-out, replacement, and related hardship exemptions, the significant effects of Local Law No. 9 on the SRO property owners are: (1) to prohibit them from altering or demolishing their buildings or converting them to any other use; (2) to compel them to restore any uninhabitable unit to "habitable condition”; and (3) to require them to keep all their units occupied as SRO *108 housing. Noncompliance with any of these provisions subjects an owner to heavy penalties.[7]
If analyzed with respect to its effect on property owners’ basic rights " 'to possess, use and dispose’ ” of their buildings (Loretto v Teleprompter Manhattan CATV Corp., supra, at 435, quoting United States v General Motors Corp., supra, at 378; see also, Restatement of Property § 5, comment e, at 11; 2 Nichols, Eminent Domain § 5.01 ["What Constitutes Property”]), it is evident that Local Law No. 9 abrogates or substantially impairs each of the three rights. As previously discussed, the coerced rental provisions deprive owners the fundamental right to possess their properties (see, part II A, supra). Moreover, these mandatory rental provisions — together with the prohibition against demolition, alteration and conversion of the properties to other uses, and the requirement that uninhabitable units be refurbished — deny owners of SRO buildings any right to use their properties as they see fit. Unquestionably, the effect of the law is to strip owners of SRO buildings — who may have purchased their properties solely to turn them into profitable investments by tearing down and replacing the existing structures with new ones (as plaintiffs claim they have) — of the very right to use their properties for any such purpose. Owners are forced to devote their properties to another use which, albeit one which might serve the City’s interests, bears no relation to any economic purpose which could be reasonably contemplated by a private investor.
Finally, Local Law No. 9, particularly in those provisions prohibiting redevelopment and mandating rental, inevitably impairs the ability of owners to sell their properties for any sums approaching their investments. Thus, the local law must also negatively affect the owners’ right to dispose of their properties. By any test, we think these restrictions deny the owners "economically viable use” of their properties.
The effect of Local Law No. 9 is unlike that of the Landmarks Law in Penn Central, which denied the owner of Grand Central neither the continued full use of its property nor a reasonable return on its investment.[8] Nor is the effect of Local *109 Law No. 9 comparable to that of the Subsidence Act in Keystone, which reduced the maximum amount of coal that could be mined, but did not interfere with the owners’ rights to continue to mine coal profitably.[9] By contrast, Local Law No. 9 totally prohibits the sole use — entirely permissible before the enactment of the law — for which investment properties are purchased: commercial development. As a substitute, it decrees that the properties must be used for SRO housing and that the owners must be satisfied with the diminished financial returns from such use. A rough analogy might be telling the mine owners in Keystone that they could no longer mine coal and that they must instead put their properties to some worthy, but less remunerative, purpose— say, storing nuclear waste.
There can be no question that the development rights which have been totally abrogated by the local law are, standing alone, valuable components of the "bundle of rights” making up their fee interests (see, Michelman, op. cit., 80 Harv L Rev, at 1233 [prospective continuing use "is a discrete twig out of (the owner’s) fee simple bundle” of rights]). Indeed, in French Investing Co. v City of New York (39 NY2d 587), we recognized that development rights "are an essential component of the value of the underlying property” and that "they are a potentially valuable and even a transferable commodity and may not be disregarded in determining whether the ordinance has destroyed the economic value of the underlying property” (id., at 597; see also, Matter of Keystone Assocs. v Moerdler, 19 NY2d 78 [invalidating the imposition of an uncompensated 180-day delay on the right of the purchasers of the old Metropolitan Opera House to demolish and redevelop the property]; Forster v Scott, 136 NY 577).
Defendants’ argument that plaintiffs have not been deprived of "economically viable use” presupposes that the effect of *110 Local Law No. 9 on their properties should be assessed by comparing the value of the rights affected or abrogated with the value of the total "bundle” comprising the owners’ property interests. But the permanent abrogation of one of those rights, without regard to its comparative value in relation to the whole, may well be sufficient to constitute a taking. Thus, in Hodel v Irving (481 US 704), the court held that the total abolition of the "right to pass on valuable property to one’s heirs” could, without more, "be a taking” (id., at 715, 717). And in Nollan, the court concluded that an easement allowing persons to pass across a private beach could constitute a taking despite the minimal impact on the total value of the owners’ property (483 US, at 831-832; see also, various comments on the theory of "conceptual severance” [i.e., assessing only the value of the rights taken without regard to its relationship to the value of the whole property]; Radin, op. cit., 88 Colum L Rev, at 1674-1678; Michelman, op. cit., 88 Colum L Rev, at 1627-1628; Fischel, Introduction: Utilitarian Balancing and Formalism in Takings, 88 Colum L Rev 1581, 1592-1593; Peterson, Land Use Regulatory "Takings” Revisited: The New Supreme Court Approaches, 39 Hastings LJ 335, 356-357). Of course, if the theory of "conceptual severance” were applied to the effect of Local Law No. 9 on the rights of SRO property owners, a taking would necessarily be found. The rights to use and to possess have been abolished and, without regard to the value of the owners’ remaining interests in their buildings, that would be sufficient.
As stated by Justice Saxe at the nisi prius court, the moratorium and antiwarehousing provisions "place[ ] petitioners in a business, force[ ] them to remain in that business and refuse[ ] to allow them to ever cease doing [that] business.” (Seawall Assocs. v City of New York, 134 Misc 2d 187, 197, supra.) By any criterion — whether the property rights abolished or impaired are considered alone, as in Hodel and Nollan, or the values of these rights are compared with the values of the properties as a whole, as in Penn Central and Keystone — the conclusion is inescapable that the effect of the provisions is unconstitutionally to deprive owners of economically viable use of their properties.
(2)
We agree with plaintiffs, moreover, that Local Law No. 9 *111 does not pass the other threshold test for constitutional validity of regulatory takings: that the burdens imposed substantially advance legitimate State interests (see, Nollan v California Coastal Commn., supra; Agins v Tiburon, supra; Penn Cent. Transp. Co. v New York City, supra).
Of course, the end sought to be furthered by Local Law No. 9 is of the greatest societal importance — alleviating the critical problems of homelessness.[10] The question here, however, concerns the means established by the local law purportedly to achieve this end. In other words, can it be said that imposing the burdens of the forced refurbishing and rent-up provisions on the owners of SRO properties substantially advances the aim of alleviating the homelessness problem? (See, Nollan v California Coastal Commn., supra, at 834, 841.) Is there a sufficiently close nexus between these burdens and "the end advanced as the justification for [them]”? (Id., at 837; see also, for discussions of the "close nexus” test which requires "semi-strict or heightened judicial scrutiny of regulatory means-ends relationships” as articulated in Nollan; Michelman, op. cit., 88 Colum L Rev, at 1607-1614; Peterson, op cit., 39 Hastings L Rev, at 354-358; Comment, Trespass at High Tide: The Supreme Court Gives Heightened Scrutiny to a State Imposed Easement Requirement, 54 Brooklyn L Rev 991, 1011-1020.)
Defendants contend that by increasing the availability of SRO units the antiwarehousing and moratorium measures will provide more available low-cost housing and, thereby, further the aim of alleviating homelessness; this relationship between means and ends, they argue, supplies the required "close nexus”. The City’s own Blackburn study, however, acknowledges that a ban on converting, destroying and warehousing SRO units would do little to resolve the homeless crisis. Indeed, the SRO units are not earmarked for the homeless or for potentially homeless low-income families, and there is simply no assurance that the units will be rented to members of either group (see, Blackburn, Single Room Occupancy in New York City, op. cit., at 5-6). While, of course, any increase in the supply of low-cost housing would benefit some *112 prospective tenants, it is by no means clear that it would actually benefit the homeless.[11]
The heavy exactions imposed by Local Law No. 9 must "substantially advance” its putative purpose of relieving homelessness. No such showing of this required "close nexus” has been made. Rather, the nexus between the obligations placed on SRO property owners and the alleviation of the highly complex social problem of homelessness is indirect at best and conjectural. Such a tenuous connection between means and ends cannot justify singling out this group of property owners to bear the costs required by the law toward the cure of the homeless problem. Indeed, by equating the "cure” with dollars — i.e., permitting "buy-out” payments of $45,000 per SRO unit in lieu of keeping the units available for rent (see, discussion of "buy-out” exemption, infra) — the terms of Local Law No. 9 itself demonstrate that the obligations placed on a few property owners are just the kind which could, and should, be borne by the taxpayers as a whole.
Finally, the questionable nexus between means and ends in Local Law No. 9 cannot be compared with the clearly defined means-ends relationships in the statutes upheld in Penn Central, Keystone and Andrus — the decisions on which defendants rely. In Penn Central, the Landmarks Law had the direct and immediate effect of saving a historic landmark, Grand Central Station, the law’s very purpose. Likewise, in Keystone, the Subsidence Act prevented the very hazards to public health, safety and the environment that it was intended to address by prohibiting the mining operations that caused them. Indeed, the court in upholding the act noted that it fell within the "nuisance exception” — i.e., that "the State has not 'taken’ *113 anything when it asserts its power to enjoin the nuisance-like activity” (480 US, at 491, n 20; see, Michelman, op. cit., 88 Colum L Rev, at 1601-1604). And in Andrus, the Eagle Protection Act protected endangered eagles by prohibiting a direct cause of their endangerment, the unrestricted sale of their parts. No such connection has been shown between the restrictions imposed on SRO property owners by Local Law No. 9 and the amelioration of the homeless crisis in New York City. The close relatedness between the ends to be achieved and those who are burdened, as existed in Penn Central, Keystone and Andrus, is just not present.
Ill
The question remains whether the added features of Local Law No. 9 — the buy-out, replacement, and hardship exemptions[12] — in some way mitigate the invidious effects of the law so that it becomes constitutionally acceptable. We agree with Justice Saxe that they do not (Seawall Assocs. v City of New York, 134 Misc 2d 187, supra). The reasons, we think, are evident.
If, as we hold, the effect of the moratorium and antiwarehousing measures is unconstitutionally to deprive owners of their basic rights to possess and to make economically viable use of their properties, merely allowing them to purchase exemptions from the law cannot alter this conclusion. In effect, the City, in the buy-out and replacement exemptions, is saying no more to the owners than that it will not do something unconstitutional if they pay the City not to do it. But if the initial act amounts to an unlawful taking, then permitting the owners to avoid the illegal confiscation by paying a "ransom” cannot make it lawful. Indeed, the stark alternatives offered by Local Law No. 9 — either submit to an uncom *114 pensated and, therefore, unconstitutional appropriation of your properties or pay the price (in cash or in replacement units) — amount to just the sort of exaction which could be classified, not as "a valid regulation of land use but 'an out- and-out plan of extortion.’ (J. E. D. Associates, Inc. v. Atkinson, 121 N. H. 581, 584, 432 A. 2d 12, 14-15 (1981)”. (Nollan v California Coastal Commn., supra, at 837; see also, Sterk, Nollan, Henry George, and Exactions, 88 Colum L Rev 1731, 1746-1751.)
Nor can the hardship exemption make a difference. It can do no more than permit the Commissioner — in the event that an owner could ever come within its provisions[13] — to exercise his discretion and lower the purchase price of escape from the law. If Local Law No. 9 creates an illegal taking notwithstanding the buy-out and replacement options — as we hold it does— it certainly does not become legal simply because an owner may, in some cases, buy his way out of the law by paying a lesser sum.
Finally, defendants’ efforts to uphold Local Law No. 9 miss a key feature of the law here and the one that distinguishes it from the Landmarks Law in Penn Central, the Subsidence Act in Keystone, and the Eagle Protection Act in Andrus. Unlike the regulatory actions in those cases, which simply limited the owners’ conduct, Local Law No. 9 not only prohibits conduct but affirmatively requires that the owners dedicate their properties to a public purpose. They must maintain their properties as SROs, they must rehabilitate them, and they must keep them fully rented (see, discussion of significant distinction for purposes of takings analysis between "affirmative easements or servitudes” [as, for example, in Kaiser *115 Aetna] and "those that are negative” [as, for example, in Penn Central]; Radin, op. cit., 88 Colum L Rev, at 1667, 1678-1680). Like the property owners in Loretto, Kaiser Aetna and Nollan, who must subject their properties to public use for purposes of fixing CATV cables or allowing public access to a private marina or across a private beach, owners of SRO buildings have had the use of their properties actually appropriated for the benefit of the public.
In short, the City, by affirmatively requiring the owners to put their properties to a public use, "is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good” (Lutheran Church v City of New York, 35 NY2d 121, 128-129; see, French Investing Co. v City of New York, supra, at 593; Sax, Takings and the Police Power, 74 Yale LJ 36, 62-63). No one disputes the City’s authority, under the police power, to require the SRO owners to put their properties to this use. As an exercise of this authority, however, the stringent obligations imposed by Local Law No. 9 without any offsetting provision for fair payment — like the governmental actions at issue in Loretto, Kaiser Aetna, and Nollan — amount to an unconstitutional confiscation of the owners’ property.
IV
We believe it is evident from an analysis of Local Law No. 9 that the moratorium and antiwarehousing provisions inevitably force property owners "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole” (Armstrong v United States, supra, at 49). Because the owners are, by the terms of the law, afforded no compensation, Local Law No. 9, we hold, is facially invalid,[14] under the "Takings” Clauses of both the Federal and State *116 Constitutions (US Const 5th, 14th Amends; NY Const, art I, §7).[15]
One last point should be made. The dissent’s erroneous analogy between this case and Lochner v New York (198 US 45) furnishes a useful perspective on what is really at issue here. In Lochner, the Supreme Court — applying a laissez faire jurisprudence of "economic due process” — overturned a law prescribing maximum working hours, on the ground that it violated the freedom of contract rights of both employer and employee; the court held that the Legislature was without power to enact such a law. Here, by contrast, no one disputes the City’s power — indeed its duty — to fashion meaningful solutions to address homelessness. No one disputes that the City has the power to prohibit the demolition of SRO properties, or direct restoration of SRO units to habitable condition to be leased at modest rents for indefinite periods. The City clearly has that power. The question is who is to pay for this and, more particularly, whether the City — in accordance with constitutional mandate — must compensate property owners before it can "place [them] in a business, force[] them to remain in that business and refuse[ ] to allow them to ever *117 cease doing [that] business.” (134 Misc 2d 187, 197, supra.) The issue is not one of "economic due process”, but constitutional command.
No one minimizes the tragic reality of homelessness. But the City’s response — to foist its responsibility on certain private property owners, by requiring them to remain in the SRO business or ransom their property rights — simply does not meet the requirements of the Federal and State Constitutions.
The order of the Appellate Division should be reversed, with costs, Local Law No. 9 declared to be unconstitutional as stated in this opinion, and defendants enjoined from implementing the law’s provisions.

. Local Laws, 1985, No. 59, a predecessor of Local Law No. 9, mandated a study of SRO housing in New York City by Urban Systems Research and Engineering, Inc. The report, written by Anthony Blackburn, was issued in February 1986 and recommended efforts by the City to preserve SRO units.

. The Fifth Amendment "Takings” Clause applies to the States through the Fourteenth Amendment (see, Chicago, Burlington & Quincy R. R. Co. v Chicago, 166 US 226).

. The Loretto court in dictum — referring to the navigational easement of passage permitting public access to plaintiffs privately owned marina in Kaiser Aetna stated that, although the easement constituted a physical invasion of plaintiffs property, it was not a per se taking but "a government intrusion of an unusually serious character” (458 US 419, 433). The court in Nollan apparently adopted a different view and it would seem that a physical taking of the type at issue in Kaiser Aetna would now be considered to be a per se taking to the extent of the occupation (see, Nollan v California Coastal Commn., 483 US 825, 832; see, Note, Municipal Development Exactions, the Rational Nexus Test, and the Federal Constitution, 102 Harv L Rev 992).

. It should be noted that the Hall decision preceded the Supreme Court’s decisions in Nollan, First Lutheran Church and Keystone Bituminous Coal Assn. v DeBenedictis (480 US 470). Defendants’ efforts to distinguish Hall upon the ground that the forced leases there were of indefinite duration and transferable are not persuasive. Here, the tenants will occupy the SRO units with all of the legal protection against eviction afforded by applicable landlord-tenant statutes, including those pertaining to rent control, rent stabilization and harassment. The significant point is that in Hall, as in the case at bar, the owners were deprived of their possessory interests —particularly the right to exclude strangers — the determinative factor in Kaiser Aetna, Loretto, and Nollan.

. Although not urged by the City, some amici contend that a physical taking should not be found because the interference with the owners’ rights resulting from Local Law No. 9 is not permanent. There is no merit to the argument for two reasons: (1) while not specifically made permanent, Local Law No. 9 is, by its own terms, to remain in effect indefinitely since its five-year terms may be extended for additional terms without limit; and (2) even if the local law be viewed as a temporary provision, it results in a deprivation of the owners’ quintessential rights to possess and exclude and, therefore, amounts to a physical taking. Under First Lutheran Church v Los Angeles County (482 US 304), where, as here, the governmental action resulted in a per se taking, the offending action constitutes a taking for whatever time period it is in effect.

. The Supreme Court seems also to have adopted the view that a regulation which has the effect of substantially frustrating "reasonable investment backed expectations” likewise constitutes a per se taking (see, e.g., Kaiser Aetna v United States, 444 US 164, 175; Keystone Bituminous Coal Assn. v DeBenedictis, 480 US 470, 493, 499; see also, Michelman, Takings, 1987, 88 Colum L Rev 1600, 1604, n 22, 1622). Such a factor, however, would be relevant to a challenge to the regulation as applied to particular owners, not a facial challenge.

. As outlined, supra, Local Law No. 9 provides for the imposition of a $150,000 civil fine for each room altered, converted or demolished in violation of the ordinance and an additional $45,000 per room for any resulting reduction in the total number of single-room occupancy units (see, Administrative Code § 27-198.2 [d] [4]; [g] [2], [5]).

. Moreover, the court in Penn Central pointed out that, while the *109 Landmarks Preservation Commission had denied an application to build more than 50 stories above the terminal, there was no showing that permission to build fewer would be denied. Additionally, the court noted that Penn Central had not been deprived of all preexisting air rights, since under the law these rights were transferable (438 US 104,136-137).

. The majority in Keystone emphasized that, under the statute there in question, the property owners could continue to engage profitably in the business for which they had invested their capital (480 US, at 485) and that the statute ultimately prevented the owners from mining only 2% of the extractable coal (id., at 493). Not surprisingly, then, the majority concluded that the owners failed to demonstrate "any deprivation significant enough” to constitute a regulatory taking (id., at 493).

. "Preventing homelessness” is what the City itself claims to be the public purpose served by Local Law No. 9 (see, municipal respondents’ brief, at 31-33; see also, Local Laws, 1987, No. 1 of City of New York § 1). We need not, therefore, apply the "close nexus” test to other, hypothetical purposes possibly advanced by the law.

. The dissenter’s claim that our ruling "authorizes the expulsion of 52,000 people” (see, dissenting opn, at 126) is utterly without basis. As we have already discussed, government has considerable latitude in regulating landlord-tenant relationships to preclude eviction in hardship, emergency and rent-control cases, and both this court and the Supreme Court have upeld such efforts (see, supra, at 105-106). The constitutional invalidity of Local Law No. 9 does not concern the protection it affords to current tenants, but its mandate that property owners rehabilitate their buildings and accept— as new residents — persons with whom they have no existing relationship whatsoever.
Finally, the dissenter’s argument that Local Law No. 9 must be upheld to prevent the disruption of tenancies is a "bootstrap”. Local Law No. 9 cannot, of course, be deemed constitutional on the ground that it would preserve tenancies which the law, in the first instance, imposes on the property owners unconstitutionally.

. See, Administrative Code § 27-198.2 (d) (4) (a). The so-called "buy-out” provisions, in effect, permit the owners to "purchase” from the City their freedom from the operation of Local Law No. 9 by paying either $45,000 per unit (e.g., $9,720,000 for a 216-unit building such as that owned by 459 West 43rd Street Corp.) or creating a replacement unit, which must first be approved by the Commissioner for any unit taken off the SRO housing rental market. In effect, the "buy-out” provisions permit the owners to repurchase the basic property rights in their buildings which the City has appropriated under Local Law No. 9. The hardship provisions (§ 27-198.2 [d] [4] [b]) permit a reduction in the "buy-out” price, at the discretion of the Commissioner, when an owner’s return on an SRO property falls below 8Vi% of assessed value. As the provisions point out, however, there are no standards or guidelines for the exercise of the Commissioner’s discretion.

. See, Administrative Code § 27-198.2 (d) (4) (b). As some of the owners argue, it is unrealistic to expect that the hardship exemption will ever be of any appreciable value to an investor in one of the Manhattan SRO properties. The level of earnings below which a given property must fall before the owner can apply for hardship relief is pegged at a mere 8 Yz% of the property’s assessed value. It is highly unlikely that any of the properties, which must be kept fully rented, will ever produce less than 8ti% of the assessed value, even though the properties are subject to rent control and rent stabilization. The assessed value generally represents only 45% of the full value assigned to the property by the City’s appraiser. Moreover, plaintiffs point out that the City’s appraisal of the property is based on their current use as low-income SRO rental housing. Thus, the City’s appraised full value will typically bear little relation to the property’s true market value for development purposes or to the amount of the owner’s purchase price.

. [5] Contrary to assertions in the dissenting opinion (see, dissenting opn, at 118,120-121), the Supreme Court and this court have long considered it entirely appropriate to adjudge the facial validity of a land use regulation when challenged by a property owner claiming an unconstitutional "taking” or other deprivation of property rights. As the Supreme Court held over 60 years ago in Euclid v Ambler Realty Co. (272 US 365), a property owner is entitled to challenge a local law regulating the use of his realty on the ground that "the ordinance of its own force operates greatly to reduce the value of [the owner’s] lands and destroy their marketability for industrial, commercial and residential uses” (id., at 386 [emphasis added]). "Assuming [the owner’s] premises”, the court explained, "the existence and maintenance of the ordinance, in effect, constitutes a present invasion of [the owner’s] property rights and a threat to continue it. Under these circumstances * * * *116 jurisdiction is clear” (id. [emphasis added]). The court further elaborated that the property owner was not claiming specific injury from the actual application of the local law, but "that the mere existence and threatened enforcement of the ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constitute^] a present and irreparable injury” (id., at 395 [emphasis added]).
More recently, in Hodel v Virginia Surface Min. & Reclamation Assn. (452 US 264) and in Keystone Bituminous Coal Assn. v DeBenedictis (480 US 470) the Supreme Court repeated the distinction between a facial challenge and one based on application. A "facial challenge”, the court noted, "presentís] no concrete controversy concerning either application of the [law] to particular [activities] or its effect on specific [properties]” (Keystone, supra, at 495, quoting Hodel v Virginia Surface Min. & Reclamation Assn., supra, at 295). Numerous such facial challenges have been sustained by both the Supreme Court and our court (see, e.g., Nollan v California Coastal Commn., 483 US 825, 832, 837; Hodel v Irving, 481 US 704, 716-717; Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 434-435; French Investing Co. v City of New York, 39 NY2d 587, 590-591; Westwood Forest Estates v Village of S. Nyack, 23 NY2d 424, 427; see also, Beacon Hill Farm Assocs. v Loudoun County Bd. of Supervisors, 875 F2d 1081).

. In view of this holding, we need not decide the extent to which, if at all, the protections of the "Takings Clause” of the New York State Constitution differ from those under the Federal Constitution. Nor is it necessary to address plaintiff’s additional arguments, including their contention that the local law is also unconstitutional under the Due Process Clause of the State Constitution (NY Const, art I, § 6).