520 EAST 81ST STREET ASSOCIATES, Appellant, v LENOX HILL HOSPITAL et al., Respondents, et al., Defendants.

First Department, May 10, 1990

## APPEARANCES OF COUNSEL

*Gary M. Rosenberg* of counsel *(William J. Robbins, Susan R. Lipp* and *Sherrie A. Taylor* with him on the brief; *Rosenberg & Estis, P. C.,* attorneys), for appellant.

*Edmund F. Wolk* for Lenox Hill Hospital, respondent.

*Carol S. Keenan* of counsel *(Ruben Klein, P. C.,* and *Ronald A. Zumbrun, Edward J. Connor, Jr.,* and *R. S. Radford,* attorneys), for Pacific Legal Foundation, *amicus curiae.*

## OPINION OF THE COURT

SULLIVAN, J. P.

This appeal involves the issue of who, if anyone, is entitled to renewal leases with respect to 39 apartments owned by 520

East 81st Street Associates (Associates) and leased to Lenox Hill Hospital, a New York not-for-profit acute-care, teaching hospital, which subleases these apartments to nurses or other Lenox Hill employees. Underlying this issue is Associates' challenge to the constitutionality of Laws of 1984 (ch 940), which amended existing law and specifically provided an exception to the nonprimary residence exemption in the Rent Stabilization Law where a not-for-profit hospital is the lease's named tenant. Chapter 940 also supplemented an exemption in Real Property Law § 226-b by providing that a not-for-profit hospital could sublet a rent-stabilized apartment to its affiliated personnel without the landlord's consent.

A brief summary of the law prior to its enactment is essential to a full appreciation of the significance of Laws of 1984 (ch 940). Laws of 1971 (ch 373), which amended the State Enabling Act for rent control and rent stabilization, originally provided an exemption from the New York City rent control and rent stabilization laws for "housing accommodations * * * not occupied by the tenant in possession as his primary residence". This same language was also used in section 5 (a) (11) of the Emergency Tenant Protection Act of 1974 (ETPA) (L 1974, ch 576, § 4), which exempted newly stabilized units. The phrase "tenant in possession" was considered broad enough to include a subtenant. Thus, if the subtenant in possession was a primary resident of the apartment, the exemption was inapplicable.

Section 41 of the Omnibus Housing Act of 1983 (OHA-83) (L 1983, ch 403) amended subdivision (a) of Administrative Code of the City of New York § YY51-3.0 (renum § 26-504 [a] [1] [f]) to provide an exemption from the Rent Stabilization Law for dwelling units "not occupied by the tenant, not including subtenants or occupants, as his primary residence, as determined by a court of competent jurisdiction". Thus, the scope of the term "tenant" was expressly restricted so as to exclude subtenants or occupants. For the purpose of determining the issue of primary residence, it was now the named tenant who had to occupy the apartment as a primary residence. No longer could he obtain the benefits of rent stabilization, including a renewal lease, because the subtenant occupied the apartment as a primary residence. OHA-83 also eliminated constructive tenancies where a corporation was the named tenant.

Laws of 1984 (ch 940, § 1) amended the nonprimary residence section of the Rent Stabilization Law (Administrative

Code § YY51-3.0 [a] [1] [f] [renum § 26-504 (a) (1) (f)]) to add that, for purposes of that clause, "where a housing accommodation is rented to a not-for-profit hospital for residential use, affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants". Section 3 of chapter 940 amended the ETPA (§ 5 [a] [11]) to add the same language (McKinney's Uncons Laws of NY § 8625 [a] [11]). Thus, in determining the issue of nonprimary residence, chapter 940 provided, in contradistinction to OHA-83, that the relevant residence is the primary residence of the nurse authorized to use the subject apartment.

Chapter 940 (§ 4) also amended section 10-a of the ETPA of 1974 (Uncons Laws § 8630-a) to afford not-for-profit hospitals the right to sublet the apartments to affiliated nurses, pursuant to Real Property Law § 226-b, without requiring the landlord's consent and without requiring that the hospital itself maintain these apartments as its primary residence. By contrast, tenants other than not-for-profit hospitals such as Lenox Hill have the right to sublet for only 2 out of every 4 years. Moreover, those tenants must, on request, provide the landlord with detailed information in connection with any request to sublet. The amendment also provided for a 15% vacancy surcharge if the landlord fails to receive "within the seven year period prior to the commencement date of such renewal lease any vacancy increases or vacancy surcharges allocable to the said housing accommodation."

Between 1968 and 1970, and pursuant to a series of leases relating to each specific apartment, which were subsequently renewed at their respective expirations, Associates rented the subject apartments to Lenox Hill. All of the apartments became subject to two renewal leases, both dated March 9, 1982, for a term commencing August 1, 1982 and expiring July 31, 1985. Pursuant to its housing program, Lenox Hill uses the apartments for affiliated personnel, who are primarily, if not exclusively, nurses. Indeed, a rider attached to the aforesaid renewal leases states, "The demised premises are to be occupied by EMPLOYEES OF LENOX HILL HOSPITAL ONLY, OCCUPANCY TO BE LIMITED TO ONE (1) EMPLOYEE IN A STUDIO AND TWO (2) EMPLOYEES IN ONE (1) BEDROOM APARTMENTS ONLY." The availability of such inexpensive housing allows Lenox Hill to attract nurses and other employees, and also permits it to pay these employees less than it would otherwise have to if the employees themselves were required to go into the market to obtain housing. Thus, by these rentals, Lenox

Hill is able to avoid having to make a capital investment in housing.

The subject building has now been converted to a condominium form of ownership, as to which, even for occupied condominium apartments, based on the expectancy that they will eventually become vacant, there is a resale market. In essence, the buyer is purchasing a reversionary interest. Studio apartments, which are generally occupied by a more transient type, are proportionately more valuable than larger apartments because of the greater likelihood that they will become vacant.

There has been a substantial turnover in the nurse subtenants occupying these apartments. On August 1, 1982, the commencement date of the last renewal leases, 37 of the 39 apartments were occupied and 2 were vacant. As of April 3, 1985, the last day of the 120-to-150-day window period prior to the July 31, 1985 expiration of the last renewal leases for serving notice of the landlord's intention not to offer a renewal lease (see, former Code of Rent Stabilization Association of New York City, Inc. § 60), only 26 of the 37 nurses in occupancy at the commencement of the leases remained. During that approximately 32-month period, 11 of the original subtenants had vacated and the 2 previously vacant apartments had become occupied. Thus, during the term of the last renewal leases, there was a turnover in one third of the apartments. After the expiration of the two leases on July 31, 1985, Associates refused to offer renewal leases to Lenox Hill. Instead, it commenced the instant declaratory judgment action.

In its complaint, Associates sought a declaration that Lenox Hill was not entitled to renewal leases and that only nurses who continually occupied their apartments since the August 1, 1982 commencement of the most recent renewal leases and who remained in occupancy 120 days prior to the expiration of those leases were entitled to renewal leases. After joinder of issue, Associates moved for partial summary judgment so declaring and also for a declaration that in any apartment in which there had been a turnover, i.e., the nurse in occupancy at the commencement of the most recent renewal lease was no longer in occupancy, the apartment was not maintained as a primary residence and no one was entitled to an offer of renewal. Associates argued that any other interpretation of Laws of 1984 (ch 940), would totally deprive it of an economically valuable reversionary interest and lead to an unconstitu-

tional taking without just compensation. Lenox Hill cross-moved for summary judgment dismissing the complaint and for summary judgment on its first, second and third counter-claims seeking declarations, *inter alia,* that it was entitled to lease renewals.

In denying Associates' motion in its entirety and granting Lenox Hill's cross motion for summary judgment, the IAS court held that "it is Lenox Hill, the named tenant on the expired renewal leases, which is entitled to renewal leases for the subject apartments". *(520 E. 81st St. Assocs. v Lenox Hill Hosp.,* 142 Misc 2d 723, 726.) The court found (at 726) that its interpretation was consistent with "the legislative history and statutory language of chapter 940, [which makes it] clear that the not-for-profit hospital is the tenant sought to be protected by the corrective legislation." Citing CPLR 1012 (b) and Executive Law § 71, the court refused to consider Associates' constitutionality argument "because the Attorney-General has not been notified that the constitutionality of the statute was in issue" *(supra,* at 726). The court, however, indicated (at 726) that in any event the argument "seems to be wholly merit-less." We disagree.

In refusing to consider Associates' constitutionality argument, the IAS court disregarded the provisions of both CPLR 1012 (b) and Executive Law § 71, which require that, where the constitutionality of a statute is in issue, it is the responsibility of the court, and not the parties, to give notice to the Attorney-General. That the IAS court failed to notify the Attorney-General or to direct Associates to do so poses no obstacle to our consideration of the issue, however, since the Attorney-General has been notified that the issue is being raised on appeal and has been served with a copy of Associates' brief.

Associates contends that the IAS court's interpretation of Laws of 1984 (ch 940), requiring it to offer Lenox Hill renewal leases effects both a physical occupation and regulatory taking of its property, for which it is entitled to be compensated.[1] A physical occupation occurs "where the government physically intrudes upon private property either directly or by authorizing others to do so." *(Hall v City of*

---

1. [4] The "Takings" Clause of the Fifth Amendment of the US Constitution applies to the States through the Fourteenth Amendment. *(See, Chicago, Burlington & Quincy R. R. v Chicago,* 166 US 226, 233-241; *Bieneman v City of Chicago,* 864 F2d 463, 467.)

*Santa Barbara,* 797 F2d 1493, 1497, *opn amended* 833 F2d 1270, *cert denied* 485 US 940; *see also, Loretto v Teleprompter Manhattan CATV Corp.,* 458 US 419, 432-433, n 9.) "[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *(Loretto v Teleprompter Manhattan CATV Corp.,* at 426.) "Such an appropriation is perhaps the most serious form of invasion of an owner's property interests." *(Supra,* at 435.) The *Loretto* court described "[p]roperty rights in a physical thing * * * as the rights 'to possess, use and dispose of it' ", and held that a permanent physical occupation "effectively destroys *each* of these rights." *(Supra,* at 435, quoting *United States v General Motors Corp.,* 323 US 373, 378 [emphasis in original].) A permanent occupation destroys an owner's "right to possess the occupied space himself, and also [the] power to exclude the occupier from possession and use of the space." *(Supra,* at 435.) Further, it "denies the owner any power to control the use of the property." *(Supra,* at 436.) "Finally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value". *(Supra,* at 436.)

■ In *Seawall Assocs. v City of New York* (74 NY2d 92, *cert denied* — US —, 110 S Ct 500), the Court of Appeals declared invalid as a physical and regulatory taking Local Laws, 1987, No. 9 of the City of New York, which prohibited the demolition or conversion of single-room occupancy (SRO) properties and required the owners to restore all units to habitable condition and lease them as controlled rents for an "indefinite period". Relying in part on *Loretto v Teleprompter Manhattan CATV Corp.* (458 US 419, *supra),* the court held that Local Law No. 9 effected a physical taking "because it 'interfere[d] so drastically' * * * with the SRO property owners' fundamental rights to possess and to exclude" *(supra,* 74 NY2d, at 106). Application of the *Seawall* analysis to this case compels the conclusion that chapter 940, as interpreted by the IAS court, has resulted in a permanent physical occupation of Associates' property by transferring its reversionary interest in 39 apartments to the tenant, Lenox Hill, the existence of which is, to all intents and purposes, perpetual. Incorporated on June 29, 1918, Lenox Hill is now 70 years old and shows no sign of ceasing operations. Thus, Associates is effectively precluded from regaining possession of its property.

Indeed, when the facts here are compared to those in

*Loretto (supra),* the severity of the physical occupation becomes clear. In *Loretto,* the court held that even the most minimal of physical occupations, i.e., the city's authorization to a cable television company to install its cable and switch boxes on the roof and side of an apartment building, constituted a physical occupation and thus, a compensable taking. Here, by contrast, a physical occupation of much more substantial dimension is involved. Rather than the taking of de minimus space to accommodate cable equipment, Associates is required perpetually *to* relinquish possession of 39 apartments to Lenox Hill.

In *Hall v City of Santa Barbara* (797 F2d 1493, *supra),* the Court of Appeals, Ninth Circuit, held that mobile home park owners who challenged a rent control ordinance which required them to offer their tenants leases of unlimited duration and strictly limited rent increases state a claim for a compensable taking. In emphasizing that the perpetual nature of the tenancy deprived the owners of control of their property, the court, in language equally applicable here, stated, "[T]he ordinance directs the landlord to give tenants a lease, a recognized estate in land, lasting indefinitely. Moreover, the landlord's residual rights in the property are largely at the mercy of his tenants; he loses practically all right to decide who occupies the property, and on what terms. If a tenant moves, the tenant alone decides who will be his successor by selecting the buyer for his rental unit; the landlord has no say as to who will live on the property, now or in the future." *(Supra,* at 1499.) In contrast, the court, in describing the normal lease arrangement, noted, "when the premises become vacant, the landlord is able to reassert a measure of control over the property. He may [choose] to occupy it himself; or to allow a friend or relative to stay there; or to keep it vacant; or make improvements in the hope of raising the rent to the extent allowed by law; or to rent it to a new tenant, presumably making the selection on the basis of factors that will maximize his total return from the property. Between tenants, the landlord can thus assert important prerogatives as property owner and make significant decisions as to the property's use." *(Supra,* at 1501-1502.)

So, too, here, if the IAS court's decision is followed, Associates loses all right, now and in the future, to determine who occupies the apartments. Concomitantly, Lenox Hill can use the apartments as a dormitory in perpetuity. "Where * * * owners are forced to accept the occupation of their properties

by persons not already in residence, the resulting deprivation of rights in those properties is sufficient to constitute a physical taking for which compensation is required." *(Seawall Assocs. v City of New York, supra,* 74 NY2d, at 103.) Moreover, since the apartments have been converted to condominium ownership, Associates is deprived of more than the right to select a tenant. It has been permanently deprived of the opportunity to sell the apartments free and clear of tenancies.

Lenox Hill asserts that the argument as to the creation of a perpetual tenancy is overcome by the requirement that the subject apartments be occupied by only its employees, who must use them as their primary residences. These requirements, however, do not change the fact that Lenox Hill has an "indefeasible right to possession" *(see, Hall v City of Santa Barbara, supra,* 797 F2d, at 1500); they merely place minimal restrictions on that right. Realistically speaking, Lenox Hill, which has a perpetual existence, will always be able to fill a vacancy created when a subtenant ceases his or her employment with it with an employee more than willing to occupy the apartment as a primary residence. "The right to occupy property in perpetuity is surely the type of interest that is protected by the taking clause." *(Supra,* at 1498.)

■ Moreover, even if Laws of 1984 (ch 940), as interpreted by the IAS court, were held not to effect a physical taking, it would nevertheless be invalid as a regulatory taking. "[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *(Pennsylvania Coal Co. v Mahon,* 260 US 393, 415.) "[T]he constitutional guarantee against uncompensated takings is violated when the adjustment of rights for the public good becomes so disproportionate that it can be said that the governmental action is 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' *(Armstrong v United States,* [364 US 40, 49]). There is no 'set formula' for determining in all cases when an adjustment of rights has reached the point when 'justice and fairness' require that compensation be paid * * *. It is basic, however, that such a burden-shifting regulation of the use of private property will, without more, constitute a taking: (1) if it denies an owner economically viable use of his property, *or* (2) if it does not substantially advance legitimate State interests". *(Seawall Assocs. v City of New York, supra,* 74 NY2d, at 107 [emphasis in original]; *see also, Nollan v*

*California Coastal Commn.,* 483 US 825, 834; *Keystone Bituminous Coal Assn. v DeBendictis,* 480 US 470, 485, 495.)

Chapter 940, as interpreted by the IAS court, fails to advance, and indeed contravenes, the purpose of the Rent Stabilization Law to which it relates. The Rent Stabilization Law was enacted because of a severe housing shortage. *(See,* Administrative Code § 26-501.) Similarly, section 8622 of the Unconsolidated Laws (ETPA § 2) declares a serious public housing emergency predicated upon "an acute shortage of housing accommodations caused by continued high demand, attributable in part to new household formations and decreased supply". ETPA was originally enacted and has repeatedly been reenacted to the present day "to forestall * * * disruptive practices tending to produce threats to the public health, safety and general welfare; that in order to prevent uncertainty, hardship and dislocation, the provisions of this act are necessary and designed to protect the public health, safety and general welfare" (Uncons Laws § 8622).

Each of these declarations of emergency evidences rent stabilization's underlying purpose of protecting residential tenants and their families during an acute housing shortage. *(See also, Sterling v Lapidus,* 10 AD2d 180, 185; *Suppus v Bradley,* 278 App Div 337.) The IAS court's interpretation of chapter 940 would increase the dislocation of long-term tenants, thereby contravening the purpose of rent stabilization, by requiring Lenox Hill to remove long-term occupants if they terminate their employment with it.

Emphasizing the existing serious nursing shortage, Lenox Hill asserts that chapter 940 promotes the public welfare by enabling not-for-profit hospitals to continue to provide adequate health care services to their respective communities. The Legislature, however, has never declared a health care emergency. Moreover, as commendable as this objective may be, Associates and similarly situated property owners should not be required to assume the burden resulting from corrective legislation which enhances the not-for-profit hospital's ability to attract sufficient personnel and thus be compelled to "dedicate their properties to a public purpose" and bear a public burden which should be borne by society at large. *(Seawall Assocs. v City of New York, supra,* 74 NY2d, at 114, 115.)

Additionally, the statute at issue is a provision of the Rent Stabilization Law, which was enacted to ameliorate a housing

emergency, not to further a policy of promoting better health care or to deal with a health emergency. Emergency legislation is not to be extended beyond the evils sought to be cured. *(See, People ex rel. McGoldrick v Regency Park,* 201 Misc 109, 111, *affd* 280 App Div 804, *affd* 305 NY 650.)* Nor should the policy of promoting better health care be furthered by interpreting the Rent Stabilization Law so as to exacerbate the very housing emergency which rent stabilization was enacted to address.

While Lenox Hill argues, as it must to sustain the legislation, that chapter 940 "substantially advance[s]" a legitimate governmental interest *(see, Seawall Assocs. v City of New York, supra,* 74 NY2d, at 107), we question how "substantially" the goal of maintaining adequate health care services is advanced by a not-for-profit hospital's right to renew the leases for rent-stabilized apartments occupied by affiliated personnel who use the apartments as their primary residence. There is nothing in the record which suggests how many housing units—other than the 39 apartments leased from Associates by Lenox Hill—are affected by chapter 940. In the absence of a legislative finding to that effect, it is difficult to accept the notion that the availability of these 39 apartments alleviates a health care emergency to any discernible degree.

The failure of chapter 940, as interpreted by the IAS court, substantially to advance a legitimate State interest is, by itself, sufficient to constitute a taking requiring just compensation. Thus, there is no need to consider the other prong of the regulatory takings test, i.e., whether the statute deprives the owner of an economically viable use of his property. *(Supra,* 74 NY2d, at 107.) Even under that test, however, there has been a regulatory taking. If only a single element of an owner's "bundle of property rights" is extinguished, there has been a regulatory taking under that second prong. *(See, Hodel v Irving,* 481 US 704; *see also, Seawall Assocs. v City of New York, supra,* 74 NY2d, at 110.)

The IAS court's decision deprives the owner of the value of an important single element in its bundle of property rights, namely, the expectation of a residual/reversionary interest in these apartments, which has now been lost. Even in rent-regulated apartments, a landlord has a reasonable expectation, at some point, of a vacancy, which will result in a reversion of possession to him. By interpreting chapter 940 as reposing a permanent tenancy in Lenox Hill, the IAS court effectively deprived Associates of its reversionary interest and

thus, of the resale value of the 39 apartments. In deciding whether a regulation constitutes a taking, courts are particularly interested in "the extent to which the regulation has interfered with distinct investment-backed expectations". *(See, e.g., Penn Cent. Transp. Co. v New York City,* 438 US 104, 124; *Keystone Bituminous Co. Assn. v DeBendictis,* 480 US 470, 473, supra.)* Recently, in *Birnbaum v State of New York* (73 NY2d 638), the Court of Appeals reaffirmed the vitality of this category of taking, stating, "This analysis generally requires an ad hoc, factual inquiry using the increasingly familiar factors of the economic impact of the government's action, its frustration of 'reasonable investment-backed expectations', and the action's public purpose or 'character' ". *(Supra,* at 645, citing, *inter alia, Penn Cent. Transp. Co. v New York City, supra,* 438 US, at 124.)

▌Lenox Hill asserts that chapter 940's provision for a 15% vacancy surcharge if there has been no vacancy increase within the prior seven-year period affords the landlord an "economically viable rate of return" on the subject apartments since it assures a greater yield than the rental rate of the standard rent-stabilized apartment. Even if this were so, however, Associates invested in the purchase of the subject apartments in the expectation that it would be able to obtain control of them at some future time, anticipating that it could sell them as vacant units and realize a much greater return than that realized from rentals. Indeed, Lenox Hill concedes that there is a vast difference between the profits to be realized from sales of the units and those which would accrue from continued rental. This expectation is defeated by the creation of a tenancy in perpetuity in favor of Lenox Hill.

In any event, Lenox Hill cannot refute a taking merely by pointing out that the statute purportedly provides for some compensation. "Whether compensation is adequate is an inquiry separate from whether there has been a taking." *(Hall v City of Santa Barbara, supra,* 797 F2d, at 1500.) If a taking has occurred, then a separate determination is required to ascertain the appropriate compensation. *(See, Loretto v Teleprompter Manhattan CATV Corp., supra,* 458 US, at 441.)

▌Accordingly, we find that the IAS court's interpretation of Laws of 1984 (ch 940), effects an unconstitutional taking of Associates' property without just compensation. Rather than strike a statute down as unconstitutional, however, courts should, whenever possible, accord it an interpretation which brings the statute into harmony with the Constitution. *(People*

*v Dietze,* 75 NY2d 47, 52.) In that regard, we reject Associates' suggested statutory interpretation, namely, that only those nurses who were in occupancy at the commencement of the last renewal leases and who remained in occupancy 120 days prior to the expiration of such leases are entitled to a renewal lease. In urging such an interpretation upon us, Associates argues that since chapter 940 directed that for purposes of determining the issue of primary residence "affiliated subtenants authorized to use such accommodations by such hospital shall be deemed to be tenants", the affiliated subtenant should also step into the nominal tenant's shoes for purposes of the benefit which flows from a determination that an apartment is maintained as a primary residence, i.e., the right to receive a renewal lease. In determining primary residency, it further argues, courts should look at the affiliated subtenant in occupancy at the inception of the most recent renewal lease since it is that subtenant who is the intended beneficiary of the lease. If the nurse in occupancy at the time the most recent renewal lease became effective continued to occupy the apartment 120 to 150 days prior to its expiration, and if the apartment is maintained as a primary residence, then he/she is entitled to an offer of a renewal lease. If the nurse in occupancy at the time the renewal lease was commenced has vacated, then the apartment cannot be said to be the primary residence of that affiliated subtenant or of the subtenant who occupied it at the time of the renewal lease's expiration. In such a case, Associates contends, it is entitled to a declaration that the apartment is not maintained as a primary residence and that a renewal lease need not be offered.

While Associates' interpretation has a certain symmetrical appeal and is, to a certain extent, consistent with the purpose of the various rent regulatory statutes that tenants actually occupying the apartments as their primary residence not be uprooted during a period of an acute shortage in housing accommodations, it ignores a significant and undisputable fact in this record. On March 9, 1982, long before the enactment of Laws of 1984 (ch 940), Associates leased the subject apartments with the express provision that they could be occupied by "employees of Lenox Hill Hospital". Thus, as long as the nurse occupying the particular apartment is a Lenox Hill employee, he/she is an intended beneficiary of the lease and, at least as to that requirement, is in full compliance with its terms. The March 9, 1982 renewal leases do not require that the employee be a primary resident. Chapter 940 imposes this

requirement. Hence, once it has been established that the occupant of a particular apartment is indeed an employee of Lenox Hill, the only remaining inquiry is whether the occupant utilizes the apartment as a primary residence. *(See, Matter of Schwartz Landes Assocs. v New York City Conciliation & Appeals Bd.,* 117 AD2d 74; *see also, Matter of Cale Dev. Co. v Conciliation & Appeals Bd.,* 94 AD2d 229.) Thus, we interpret chapter 940 as requiring Associates to offer a renewal lease to those Lenox Hill employees who occupied the subject apartment as a primary residence at the expiration of the March 9, 1982 renewal lease.[2] Such an interpretation results in the continued occupancy of these apartments by those persons occupying them as their primary residence for as long as they continue to do so. Since the renewal lease is offered to persons, rather than to Lenox Hill, an institution with a virtually limitless existence, Associates has a reasonable expectation of a vacancy at some point. When such a vacancy occurs, it can exercise the prerogatives of ownership and determine how the property is to be used.

Finally, we reject Lenox Hill's argument that it is entitled to a renewal lease as a matter of law since Associates failed to serve a 120-to-150-day notice of nonrenewal. *(See, e.g., Golub v Frank,* 65 NY2d 900; *Crow v 83rd St. Assocs.,* 68 NY2d 796.)* Former Code of the Rent Stabilization Association of the City of New York, Inc. § 60's notice requirement is inapplicable to a takings claim. The holdings of *Golub* and *Crow* with respect to the notice requirement are limited to a landlord's assertion of a right to refuse renewal on the basis of nonprimary residence. No such claim is asserted here.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Edward J. Greenfield, J.), entered June 15, 1988, should be reversed, on the law, without costs or disbursements, plaintiff's motion for partial summary judgment granted, a declaration made that defendant Lenox Hill is not entitled to renewal leases with respect to the subject apartments and that Lenox Hill employees who occu-

---

2. We reject Associates' argument that occupancy during the 120-to-150-day window period is essential to entitlement to a renewal lease. The 120-to-150-day notice provision is intended to benefit the tenant with respect to his/her status at the lease's expiration, not to establish renewal eligibility. Moreover, any Lenox Hill employee taking possession after that date and prior to the lease's expiration was, under the March 7, 1982 leases, lawfully in possession and, if using the apartment as a primary residency, entitled to an offer of a renewal lease.

pied said apartments as their primary residences at the expiration of the March 9, 1982 leases are so entitled, and the cross motion denied.

Ross, MILONAS, SMITH and RUBIN, JJ., concur.

Order and judgment (one paper) of the Supreme Court, New York County, entered on June 15, 1988, unanimously reversed, on the law, without costs and without disbursements, plaintiff's motion for partial summary judgment granted, a declaration made that defendant Lenox Hill is not entitled to renewal leases with respect to the subject apartments and that Lenox Hill employees who occupied said apartments as their primary residences at the expiration of the March 9, 1982 leases are so entitled, and the cross motion denied.